# CONSOLIDATED MECHANICAL CONTRACTORS, INC. *v.* BALL ET UX.

[No. 45, September Term, 1971.]

*Decided November 10, 1971.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*William M. Nickerson* for appellant.

*Francis D. Murnaghan, Jr.,* with whom were *A. Harold DuBois, A. Freeborn Brown* and *Lawrence S. Lanahan* on the brief, for appellees.

MCWILLIAMS, J., delivered the opinion of the Court.

In November 1966 Harlin Ball fell into a hole and because he was hurt he and his wife sued the appellant (Mechanical). The case was tried in the Circuit Court for Baltimore County before Haile, J., and a jury early in November 1970. The jury gave Ball $100,000; they gave Ball and his wife $20,000. Motions for judgment n.o.v. and for a new trial were denied. From the ensuing

judgments Mechanical has appealed, assigning as error Judge Haile's unwillingness to direct a verdict in its favor. The error was threefold, it says. Tich (about whom more later) should not have been allowed to give evidence as an expert; Ball should have been held, as a matter of law, to have been contributorily negligent or else to have assumed the risk of injury; Ball proved too much and too little, calling for the application of the "Langville rule." *Langville v. Glen Burnie Coach Lines, Inc.*, 233 Md. 181 (1963). Since we see no error we shall affirm the judgments.

Mechanical had contracted with the United States (Government) for the replacement of underground steam lines at the Aberdeen Proving Grounds. We shall be concerned only with the line running from Manhole No. 6 to the southwest corner of Building No. 338, a distance of about 120 feet, 80 feet of which was paved to accomodate the movement of tanks and other heavy vehicular traffic. To do its job Mechanical had to dig a trench about six feet deep. It was required by the contract to place "guard rails, barricades and red lights or torches" around any excavation wherever it was "exposed to walkways, sidewalks, driveways or thoroughfares" in order to keep pedestrians and vehicles from blundering into it.

The Government, in 1965, had employed Ball as an experimental mobile equipment mechanic. On 4 November 1966 he was assigned to the night shift, 4:00 p.m. to 12:30 a.m. He and another mechanic were engaged in replacing the front differential of an Army truck—a matter of some urgency, it seems. Around 11:00 p.m. Ball left the automotive shop, Building No. 338, to dump the dirty oil that had been drained from the discarded differential and to obtain from the oil shed fresh oil for the new differential. After dumping the dirty oil he set out for the oil shed. He could have gone back through the building and out again through a side door but he chose the more direct route which was a graveled path running across an unpaved grass plot and along the outside of the front wall of the automotive shop about a

foot or two from the wall. This was the route customarily used by all of the mechanics whenever a trip to the oil shed became necessary after first dumping dirty oil.

On 4 November Mechanical's job was nearly finished. The pipes had been installed, the trench (most of it) had been backfilled, the paving had been replaced and had been allowed to harden, the barricades and the "blinkers" had been removed. The last 10 or 12 feet of the trench, where it ran through the grass plot, had not been backfilled. It seems that completion had been scheduled for Monday, 7 November, and in fact it was done on Monday. There were no barricades, guard rails, ropes, lights or torches near the open trench. The area was poorly lighted at the time; one witness said it was "completely dark"; another said it was "black as pitch."

In common with other employees Ball had been aware of Mechanical's activities during the weeks preceding 4 November. When he reported for work on 2, 3 and 4 November he drove his car over the paving where the trench had been. As he put it, "It all looked finished, everything was done and * * * [he] thought the job was completed." He did not know that the end of the trench had not been backfilled.

On his way to the oil shed he fell into the open trench. After he got his bearings he clambered out but whether he then went to the oil shed or returned to the shop is unclear. There is testimony both ways, but whether it is one way or the other matters little. The next morning he visited the post hospital where he was treated for injuries to his left hand and to his back. In time it developed that his injuries were more serious than at first they seemed.

At trial Ball called Gerald L. Tich to testify in his behalf. Excerpts from his testimony follow:

"Q. Where are you employed, sir? A. State Department of Education, Division of Vocational Rehabilitation.

"Q. For how long have you been associated with the State Department of Education, Division of Vocational Rehabilitation? A. Five years.

"Q. During this period of time, did you receive any special training or courses in vocational rehabilitation? A. Yes, I have.

"Q. Where, sir? A. I have taken courses at the University of Maryland, Loyola College and special courses in alcohol at Hood College and at Rutgers Institute in New York.

"Q. Tell us, briefly, what the Division of Vocational Rehabilitation is? A. We are involved in the process of receiving referrals from private physicians and from hospitals, from Social Security, the Department of Public Welfare, to evaluate a person's capacity to work. The program was established by the Federal Government in 1920. It was felt at that time and it is felt now that we are able to substantially able to remove many people from the welfare rolls or from the rolls of Social Security to stability by vocational rehabilitation.

"Q. Did there come a time when Mr. Harlin Ball was referred to your office? A. He was referred by the Social Security Administration in December of 1968.

"Q. And, did you conduct some sort of an examination into his background, working abilities? A. Yes, if I can put it, perhaps, into a historanic [sic] light. He was referred by the Social Security Administration in December of 1968. We had several discussions about the problem. I had gotten a report from Dr. Aaronson, from Dr. Filtzer and from other orthopedic surgeons involved. I was not satisfied and neither was Mr. Ball and we went to Dr. Pierpont and with his permission, I referred him privately to Dr. Robert Abrams.

"Q. Who is Dr. Robert Abrams? A. He is an orthopedic surgeon.

"Q. Now, with this medical information, did you have any other examinations which your office performed, some sort of tests? A. Yes, we have private psychological tests in order to make a full assessment.

"Q. This, again, is on a referral basis, is it not, other agencies or other persons are involved. You are hiring other persons to do this? A. Yes.

"Q. How about in your office itself? A. Certainly, I am adept and able to make vocational evaluation. The approach is client centered which is in some way different other than the other evaluation. It is a very subjective measure.

"Q. Over what period of time did this examination take? A. From December of 1968 until Mr. Ball and I concluded our relationship which was April of 1970.

"Q. And in April of 1970, what was the opinion of the Division of Vocational Rehabilitation?

"(Mr. Nickerson) Objection. It appears obvious from the man's testimony that he is going to relate this to certain reports, medical information he received from other people, so I think we ought to sift that out before he testifies unless he is going to testify from his own examination and his own knowledge."

\* \* \*

"(The Court) I wanted to rule on the objection. I think it would be well for the court to understand just what this opinion arises out of, whether it is the psychological evaluation or the vocational evaluation. \* \* \*."

\* \* \*

334

"(The Court) I need a further definition of what a vocational evaluation involves.

"(The Witness) It involves a total assessment of an individual taking into consideration the medical aspect, the vocational aspect, the psychological aspect, the sociological aspect, the sum total of one's existence, if possible, to assess all of the factors involved and putting them into some meaningful light."

\* \* \*

"(The Court) This is a public service then, to industry and employees?

"(The Witness) Perhaps so, if we can remove him from the rolls of dependency, he is certainly a tax paying citizen.

"(The Court) My decision is to allow him to testify to his vocational evaluation.

"(Mr. Nickerson) May I note an exception, for the record?

"(The Court) Yes.

"(Mr. Dubois) State what your final evaluation was with respect, from the vocational rehabilitation standpoint of view? A. I made recommendations to Mr. Ball in light of his disability without further medical disability, he would be permanently and totally disabled from work as far as we know in this area.

"Q. You are familiar with the vocational rehabilitation in the Baltimore-Harford County area? A. Yes.

"Q. And, the physical capabilities required for various jobs? A. Yes."

\* \* \*

"Q. Were there any other agencies you got information from? A. The Social Security Administration.

"Q. Is that the only government agency? A. Well, different departments in the Social Security Administration. That's it.

"Q. What were the two departments? A. One was Disability Determinations which make a disability determination of a person's ability or inability to work. The other was a re-determination by Social Security since Mr. Ball was turned down the first time. They did a reevaluation with a hearing examiner. At that time he was allowed Social Security benefits.

"Q. Total disability benefits? A. Yes."

## I.

Mechanical attacks the testimony of Tich because, it says, his opinion was based in part on medical reports not in evidence, thereby making it inadmissible despite the fact that it was based also in part on medical reports in evidence and in part on many conversations and conferences with Ball.

It is generally true that the opinion of an expert may not be based in whole or in part on the opinions, inferences and conclusions of other witnesses, *Jackson v. Jackson,* 249 Md. 170 (1968); *Mt. Royal Cab Co. v. Dolan,* 168 Md. 633 (1935); *Quimby v. Greenhawk,* 166 Md. 335 (1934), nor on reports and examinations of others if they contain only opinions, inferences or conclusions. *Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co. v. Messenger,* 181 Md. 295 (1943); *Equitable Life Assur. Soc. v. Kazee,* 257 Ky. 803, 79 S.W.2d 208 (1934); *Robertson v. Coca Cola Bottling Co.,* 195 Ore. 668, 247 P. 2d 217 (1952). *See also* 2 Wigmore, *Evidence* § 657 (3d ed. 1940); *McCormick on Evidence* § 15 (hornbook series 1954); 31 Am. Jur. 2d *Expert and Opinion Evidence* § 42 (1967); 19 A.L.R.3d 1008. But it is true also that an expert witness who has heard the entire testimony in a case and who assumes the truth of it all, where it is not conflicting, may base his opinion upon *facts* testified to by other witnesses, or upon *facts* contained in reports or examinations made by third parties. *Wilhelm v. Burke,* 235 Md. 412 (1964); *State ex rel. Solomon v. Fishel,* 228 Md. 189 (1962); *Ihrie v.*

*Anthony,* 205 Md. 296 (1954); *Bethlehem-Sparrows Point Shipyard, Inc. v. Scherpenisse,* 187 Md. 375 (1946); *Langenfelder v. Thompson,* 179 Md. 502 (1941). Admittedly it is often hard to draw the line between fact and opinion. The usual objection seems to be based on the premise that hearsay will be the foundation of the opinion. While there is considerable authority to the contrary we think there is support for the view that such opinion evidence, in some circumstances, may be admissible, for instance where such reports are relied on by the expert in the practice of his profession. *See McCormick on Evidence* § 15 (hornbook series 1954), and 3 Wigmore, *Evidence* § 688 (Chadbourn rev. 1970).

In *State Roads Comm'n v. Novosel,* 203 Md. 619 (1954), a real estate expert was asked to state his opinion in respect of the cost of excavating earth. It was insisted by the appellant that since the witness had not been shown to possess expert knowledge of the cost of excavating land he should not have been permitted to testify. Chief Judge Sobeloff, writing for the Court, said:

> "An expert may be one who is trained in assembling and evaluating information in allied fields in which he lacks the same first-hand knowledge that he possesses in his own specialty. All that Mr. Cox did falls well within his area of expertness, and it would have been in order for the State to challenge his figures and, if it could, to offset them by opposing testimony." *Id.* at 626-27.

In *Taylor v. Monongahela Ry. Co.,* 155 F. Supp. 601, 604 (W.D. Pa. 1957), *aff'd per curiam* 256 F. 2d 751 (3d Cir. 1958), a physician was asked to give an opinion based on laboratory reports and the medical history received from the treating physician. While recognizing the restrictions imposed on such opinions by some courts, the trial judge, citing McCormick, concluded the restrictions were inapplicable and that there was no basis for assuming that the patient gave an untrue history to his

physician. Since the reports were held to be reliable, the opinion was therefore, admissible.

More recently in *Jenkins v. United States,* 307 F. 2d 637 (D.C. Cir. 1962), the court held that the trial judge had erred in refusing to allow a psychiatrist to testify that the defendant was mentally ill at the time of the alleged offense. The court said:

> "It is at least as likely, however, that the court predicated its ruling on cases which bar an expert's opinion based upon facts not in evidence unless it is derived solely from his own observations. But we agree with the leading commentators that the better reasoned authorities admit opinion testimony based, in part, upon reports of others which are not in evidence but which the expert customarily relies upon in the practice of his profession." 307 F. 2d at 641.

A like approach will be found in other cases. For example, in *Roberts v. State,* 41 Wis. 2d 537, 164 N.W.2d 525 (1969), the court found no error in the trial judge's allowing a psychiatrist to rely, in part, upon the opinions of two psychologists to whom the defendant had been referred because physicians' opinions are often dependent, in part, upon facts or opinions found by others and upon whom they rely in their practice. In *Vinicky v. Midland Mutual Cas. Ins. Co.,* 35 Wis. 2d 246, 151 N.W.2d 77 (1967), the court stated the "established" rule in Wisconsin to be that it is proper for a physician to make a diagnosis based in part on medical evidence of which he has no personal knowledge. *See also Brown v. United States,* 375 F. 2d 310 (D.C. Cir. 1966) ; *Boehme v. Maxwell,* 309 F. Supp. 1106 (W.D. Wash. 1968) ; *Schooler v. State,* 175 S.W.2d 664 (Tex. Civ. App. 1943) ; and *Sundquist v. Madison Rys. Co.,* 197 Wis. 83, 221 N. W. 392 (1928).

It will at once be observed that in none of the cases cited above was a non-professional witness allowed to express an expert opinion based in part upon reports

not in evidence. Thus we are confronted with the question whether Tich (a non-professional) was qualified to use the reports as he did. What McCormick has to say seems enlightening:

> "To warrant the use of expert testimony * * * two elements are required. First, the subject of the inference must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman, and second, the witness must have such skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth. The knowledge may in some fields be derived from reading alone, in some from practice alone, or as is more commonly the case, from both." *Id.* at 28-29.

It is settled in Maryland that the test is whether the expert's opinion will aid the trier of fact, *Continental Ins. Co. v. Kouwenhoven*, 242 Md. 115 (1966) ; *Rotwein v. Bogart*, 227 Md. 434 (1962), and the trial judge has wide discretion in determining whether the expertise of the witness has been established. *Brinsfield v. Mayor and City Council of Baltimore*, 236 Md. 66 (1964). *See also Hewitt v. Board of Censors*, 243 Md. 574 (1966).

Tich was not asked to give an opinion in respect of Ball's *medical* disability. It is true, of course, that he had access to and perhaps he made use of information from medical reports, as well as other sources. Additionally he was able to consult with Ball and to subject him to certain tests. His opinion may well be the result of a careful screening of all of the available evidence, not merely the evaluation of an assortment of medical records. His testimony reflects also the inability of Ball to obtain employment. His position in the Division of Vocational Rehabilitation and the length of his service ought to qualify him to testify as he did and we see no reason why he should be obliged to disregard the medical evi-

dence when such evidence, at least to some extent, seems to be relied upon by people in his specialty. Nor are we persuaded that the reports, whether in evidence or not, are unreliable as hearsay evidence. In the main they are uncontradicted.

In sum, and while we may be oversimplifying the issue, it does seem to us that when we strip the occupational gobbledy-gook from Tich's testimony all he really seems to be saying is that for about 16 months he tried, without success, to find a job for Ball. What the physicians, almost without exception, said was wrong with Ball appears to be the reason why Tich was unsuccessful but it is surely fair to say he would have been just as unsuccessful without the medical reports. Since, in the circumstances, we think his testimony was admissible it is unnecessary for us to consider whether, as urged by Ball, it came in without objection.

## II.

We think *Kasten Construction Co. v. Evans,* 260 Md. 536, 540-45 (1971), is dispositive of the contention that Ball, as a matter of law, was either negligent or that he assumed the risk of injury. We do not see here the essential distinct, prominent and decisive act or omission about which reasonable minds would not differ in declaring it to be negligent. Nor do we see any undisputed evidence or any inference permissible therefrom *clearly* establishing that the risk of danger was *fully* known to and *understood* by Ball.

## III.

Judge Prescott (later Chief Judge) delivered the opinion of the Court in *Langville, supra.* Well established, he said, was the rule

"* * * that the burden [of proving affirmatively that the defendant's negligence was the proximate cause of the defendant's injuries] is not met by proof adduced by the plaintiff to the effect that defendant's negligence may have

caused the injuries, or even that it probably did cause them, if it also appears from plaintiff's evidence that the injuries may have resulted from some other cause for which the defendant is not responsible. The rule was stated by Chief Judge McSherry for the Court in *Strasburger v. Vogel,* 103 Md. 85, 91, 63 A. 202, thus: 'But when the plaintiff himself shows that the injury complained of must have resulted *either* from the negligence of the defendant *or* from an independent cause for the existence of which the defendant is in no way responsible, he cannot be permitted to recover until he excludes the independent cause as the efficient and proximate cause of the injury * * *.' " 233 Md. at 185.

To compare *Langville* with the case at bar is to compare peaches with bananas. There school bus A ran into the rear of school bus B. The injured plaintiff, a passenger in school bus A, sought damages on the theory the driver of school bus A was negligent. At trial, while offering little or no proof of the driver's negligence, she produced witnesses whose testimony made a strong showing of "sudden and unexpected brake failure." In the case at bar Ball offered abundant proof that Mechanical dug the trench, that the backfilling had not been completed, that it was completed on the following Monday and that the open trench had been left unguarded. We have not found nor have we been shown any evidence that anyone else had anything to do with the trench. Mechanical makes much of the testimony of Dale Baker, a government electrical worker, who repaired some electrical wiring in the trench on Friday afternoon (the day of the accident). He said "we [had] laid wires in there for the public address system" at the time "that ditch was opened." Apparently Mechanical's men had damaged the wires and Baker's job was to repair the damage before the trench was backfilled. Mechanical claims

there is evidence from which can be drawn "a clear inference" that it had already backfilled the hole before Friday, 4 November, and that if Ball fell into it then it must have been reopened by some other agency. We think that, far from being a clear inference, it is rather a forlorn speculation. We do not think *Langville* is applicable here.

*Judgments affirmed.*
*Costs to be paid by the appellant.*