*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-1071

CHARLES JOHNSON, II, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CF1-004048)

(Hon. Michael O'Keefe, Trial Judge)

(Submitted April 3, 2025            Decided August 28, 2025)

*Brian D. Shefferman* was on the brief for appellant.

*Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Marco Crocetti*, *Kathleen Houck*, and *Amanda Claire Hoover*, Assistant United States Attorneys, were on the brief for appellee.

Before MCLEESE, HOWARD, and SHANKER, *Associate Judges*.

SHANKER, *Associate Judge*: This case requires us again to consider the "report-of-rape" rule. That rule—which we first analyzed in *Fitzgerald v. United States*, 443 A.2d 1295 (D.C. 1982) (en banc); examined more comprehensively in *Battle v. United States*, 630 A.2d 211 (D.C. 1993); and addressed most recently in

*Torney v. United States*, 300 A.3d 760 (D.C. 2023)—constitutes "a limited exception to the bar on prior consistent statements: out-of-court reports of rape may be admitted in order to accommodate the vestiges of long-standing societal misconceptions of how victims of rape must behave." *Torney*, 300 A.3d at 778. Thus, under the rule, in a sex-offense case, otherwise inadmissible out-of-court statements may be admissible to show that the complainant reported the sexual assault to someone. *See id.* at 778-79. "[B]y being permitted to put forth reports of rape," we have explained, "the sexual assault complainant would be able to (1) negate the assumption that if there is no such evidence, no complaint was made; (2) show that the complainant behaved as is expected traditionally, i.e. by making a prompt report; and (3) rebut the claim of recent fabrication." *Id.* at 778-79 (quoting *Dyson v. United States*, 848 A.2d 603, 611 (D.C. 2004)) (citation modified).

We cautioned in *Torney*, though, that "*Battle* is not an open invitation to allow any and all forms of report," *id.* at 779—"*Battle* clearly confined its scope to admitting only enough facts to substantiate that a report was made, solely for the purpose of combatting societal misconceptions," *id.* at 780. One member of the *Torney* division, moreover, lamented that, "[a]lthough we have cautioned against presenting too many statements or too many details from those statements, the government has shown little restraint." *Id.* at 783 (Fisher, J., concurring in part, dissenting in part, and concurring in the judgment). We must decide here whether

the government has again failed to exercise the restraint required by our cases.

Appellant Charles Johnson, II, was charged with thirteen counts of first- and second-degree child sex abuse and related offenses stemming from alleged conduct between November 2019 and September 2021 involving complainant J.T., who was nine to ten years old at the time and the daughter of Mr. Johnson's then-girlfriend, Janielle T.  In July 2022, J.T. told Janielle T. that Mr. Johnson had repeatedly sexually assaulted J.T. over that period.  Janielle T. pulled out her cell phone and recorded an almost-twenty-minute video of her conversation with J.T.  At Mr. Johnson's jury trial, both J.T. and Janielle T. testified, including about J.T.'s report of the sexual assaults to Janielle T.  But the trial court also admitted, under the report-of-rape rule, the entirety of the recording, which contained extensive details and anguished discussions; allegations against Mr. Johnson that were not raised under oath at trial, including several allegations of uncharged violent criminal conduct; and highly charged reactions and comments by Janielle T.

The jury found Mr. Johnson guilty of nine counts of first-degree child sex abuse, one count of attempted first-degree child sex abuse, one count of second-degree child sex abuse, and one count of simple assault.  The trial court sentenced Mr. Johnson to a total term of 384 months of imprisonment.  Mr. Johnson appeals, arguing, as relevant here, that the trial court erred in admitting the entire

recording of Janielle T. and J.T. We agree that admission of the recording was harmful error and therefore reverse and remand for further proceedings.[1]

## I.     Background

The evidence at trial included the following. J.T. is the daughter of Janielle T. and has a younger brother. In 2017, Janielle T. and the two children moved into an apartment in southeast Washington, D.C. In early 2018, Janielle T. entered the Metropolitan Police Department (MPD) Police Academy as a cadet. While there, she met and started dating Mr. Johnson, another MPD cadet. Janielle T. introduced Mr. Johnson to her children and, eventually, Mr. Johnson moved into Janielle T.'s apartment. Initially, Mr. Johnson and J.T. had an "unbreakable" "father[-]daughter relationship."

J.T. testified that Mr. Johnson began sexually abusing her when she was nine years old. At trial, J.T. described in detail numerous instances of Mr. Johnson forcing her to engage in oral or anal sex. According to J.T., Mr. Johnson often used games, candy, or a blindfold during his abuse of J.T. On one occasion, J.T. threw up after Mr. Johnson forced her to engage in oral sex. After that incident, she began

---

[1] Mr. Johnson also challenges the denial of his motion for a new trial based on newly discovered evidence. In light of our ruling regarding admission of the recording, we need not address that claim.

thinking about committing suicide because she felt "trapped" and "couldn't do anything about it." According to J.T., in the period leading up to Mr. Johnson's moving out of the apartment, Mr. Johnson forced J.T. to engage in oral sex "once or twice a week."

J.T. did not report Mr. Johnson's sexual abuse of her to her mother, other family members, or her doctor while it was ongoing. J.T. said that she was scared of doing so and that Mr. Johnson bribed her with fake currency in an online game and said he would take her away with him if she told anyone. J.T. testified that she told her mother about a "dream" in which Mr. Johnson touched her, but she did not "really tell" her mother about the assaults. In the grand jury, J.T. had testified that Mr. Johnson threatened to hurt Janielle T. if J.T. told anyone about the abuse, but at trial J.T. disavowed that claim, saying that the threat in fact occurred only in her dream and that she had testified about it in the grand jury because "sometimes most things that's in my dreams happens."

In September 2021, Mr. Johnson broke up with Janielle T. and moved out of the apartment. When Mr. Johnson moved out, J.T. was "sad and upset[ ]" "[b]ecause even if he was doing all of those things to [her], [she] still loved him." After he moved out, Mr. Johnson still played "[r]egular father and daughter games" with J.T., took J.T. shopping, and celebrated birthdays and holidays with her. Janielle T.

acknowledged that she was "angry," "upset," and "mad as hell" about Mr. Johnson leaving. In October 2021, Janielle T. learned that Mr. Johnson was dating another MPD cadet and sent him an angry text message about it.

J.T. testified that in July 2022, ten months after Mr. Johnson moved out, she tried to kill herself. J.T. said that she grabbed a belt out of her bedroom, went into the bathroom, tied the belt onto the shower curtain rod, and wrapped the belt around her neck. As she was about to jump from the bathtub ledge, Janielle T. came home from work and came into the bathroom. Janielle T. asked, "[W]hat are you doing?" and pulled J.T. down. J.T. began crying and told her mother what Mr. Johnson had done.

Janielle T., as she described it, "went into police mode" and recorded a video on her cell phone.[2] In the video, which is nineteen minutes and forty-seven seconds long, Janielle T. asked J.T. a series of questions about what happened and J.T. described several instances of Mr. Johnson's sexual abuse. In the beginning of the recording, Janielle T. is sitting on the sofa, and next to her is the belt that J.T. had

---

[2] The recording is essentially an audio recording, as the camera is pointed at a wall or the ceiling almost the entire time and J.T. is seen on camera for only a few seconds.

attempted to use, visible for barely a second. This brief portion of the recording was the only portion initially presented to the jury.

As discussed further below, however, over Mr. Johnson's objection, the entire video was played for the jury during the government's re-direct examination of Janielle T. In addition to J.T.'s detailed descriptions of the sexual abuse, the jury heard J.T. say, among other things, that Mr. Johnson forced her to engage in oral sex ten to twenty times; that he raped her for "three" years;[3] that Mr. Johnson said that anytime J.T. did something bad or something he did not like, he would rape her; and that Mr. Johnson threatened that he would "blow up the whole house," "kill" Janielle T., and break into the apartment through the balcony and "kidnap" J.T. if J.T. told anyone. Although there was no in-court testimony that Mr. Johnson had threatened to kill Janielle T., the jury heard J.T. say in the recording that she "didn't want him to kill [Janielle T.] so [she] did what he said to do." The jury also heard Janielle T. crying loudly; repeatedly exclaiming, among other things, "oh my god," "I'm so sorry," and "I could have protected you"; asking J.T. if she "really believed" that Mr. Johnson was going to kill Janielle T., to which J.T. responded "yes"; and stating that "God . . . is going to get him for what he did."

---

[3] J.T. said both "two years" and "three years."

Janielle T. took J.T. to the police station that same day to report Mr. Johnson's sexual abuse. Two detectives conducted a preliminary interview with Janielle T. Janielle T. gave an MPD detective a notebook that J.T. used to write down her thoughts. J.T. had written on a page labeled "Jan. 12th" that "CJ [Johnson] raped me," that she was "tra[u]matized," and that he was "the person that is suppossed [sic] to love me and protecting [sic] me." Janielle T. also gave the detective a red and black blindfold that matched the one J.T. described Mr. Johnson using on her, which was a blindfold Janielle T. and Mr. Johnson had used in their sexual activity, and a purple bottle of lubricant that J.T. had described.

A sexual assault nurse examiner at the Child and Adolescent Protection Center at Children's Hospital examined J.T. When the nurse examiner asked J.T. "if anyone had touched her in a way that made her feel uncomfortable or bad," J.T. responded, "[M]y stepfather touched me on my chest, butt and he put his penis in my mouth." The nurse examiner then asked "if he ever put his penis in her vagina or her butt," and J.T. responded that "he put his penis in her butt, which caused her pain and wet stuff came out and this happened on more than one occasion." During the examination, the nurse examiner did not find any injuries, which she testified was not "inconsistent with what [J.T.] told her."

J.T. had previously lied to investigators at Janielle T.'s request. When J.T. was about four or five years old, her brother, who was almost a year old, fell off the bed and broke his leg. Janielle T. took him to the hospital, where she falsely told Child and Family Services Agency (CFSA) investigators that J.T. had stepped on her brother's leg. Janielle T. instructed J.T. to tell the same story. J.T. initially repeated the same story to the CFSA investigator, but during her interview, J.T. whispered in the investigator's ear that her brother's fall was an accident and that her mother had told her to lie. J.T. acknowledged at trial that she "lied because mom said to lie."

In the defense case, a DNA analyst at Signature Science testified that she conducted DNA analysis comparing swabs of potential DNA on the blindfold with buccal swabs taken of J.T., Janielle T., and Mr. Johnson. Her analysis found that Mr. Johnson's DNA and Janielle T.'s DNA were both part of the mixture obtained from the blindfold and that J.T. was excluded as a contributor. The analyst acknowledged that DNA can be wiped off or cleaned off of an object and that the quality of the DNA may degrade over time depending on the environment.

The jury found Mr. Johnson guilty of first-degree child sex abuse, attempted first-degree child sex abuse, second-degree child sex abuse, and simple assault. The

trial court sentenced Mr. Johnson to 384 months of imprisonment. This appeal followed.

## II.    Analysis

Mr. Johnson argues that the trial court erred in admitting the entire recording of Janielle T. and J.T. discussing the sexual assaults and that the error was not harmless. We agree and therefore reverse Mr. Johnson's convictions and remand for further proceedings.

### A.    Additional Background

1.    Before trial, the government moved in limine for admission of portions of J.T.'s statements in the recording. The government argued that J.T.'s statements were admissible under the report-of-rape rule, recognizing that the testimony would be admissible not for the truth of the matter asserted but for the fact that the statements were made, and that only statements sufficient to identify the crime, the time and place, and the perpetrator would be admissible. Mr. Johnson opposed, arguing that J.T.'s statements in the video were "highly detailed hearsay" and that the only admissible statements would be those identifying "instances of improper physical contact with no additional details permitted."

The government later supplemented its motion, seeking conditional admission of the entire video on re-direct examination or in the government's rebuttal case if necessary to "rebut a defense theory of fabrication." The government argued that if Mr. Johnson "open[ed] the door" by pursuing a fabrication theory, the government could introduce the entire video, although not as substantive evidence or for the truth of the matters asserted. In this motion, the government's argument seemed to be that Mr. Johnson would "open the door" to admission of the full recording by pursuing either a more general defense that Janielle T. and J.T. were fabricating the allegations against Mr. Johnson or a more specific argument that Janielle T. and J.T. staged the video.

At a hearing on the motion, the trial court stated, "If there's going to be a claim of fabrication then it seems to me the jury should have a right to . . . [hear] it and see it for themselves." The court added that Mr. Johnson could "argue that the fact that she recorded it goes to her intent to create this staged interview," but that it is "for the jury to decide whether they believe it or not." Although defense counsel stated, "Well, ultimately and theoretically I agree with the [c]ourt's analysis," counsel asserted that because Janielle T. was a police officer who essentially conducted an interview of J.T., Janielle T. engaged in "histrionics" during the recording, and the recording appeared to be a "staged event," the video "is not admissible." The trial court stated that it would "have to see how things play out at trial," but it was of the

view that "if you're going to challenge that it's authentic [then] the government should be able to show it to the jury and they could make up their minds as to whether they believe you or believe the government or believe the folks in the video."

2.     In his opening statement, defense counsel suggested that Janielle T. and J.T. had a motive to make up the allegations because Janielle T. was "ballistic" and "angry" and J.T. was "heart broken" when Mr. Johnson broke up with Janielle T. Counsel also observed that the fact that no one recovered a belt called into doubt the attempted suicide story. And he told the jury about Janielle T.'s and J.T.'s false story to CFSA, stating that Janielle T. put the idea in J.T.'s head "to lie because that's what the mother wanted." Defense counsel suggested that the jury should make note of that incident when deciding whether it "believe[s] [t]he story that's coming from" J.T.

In the government's case-in-chief, while it was questioning Janielle T. about her discovery of J.T.'s suicide attempt, the government introduced and the court admitted a brief snippet of Janielle T.'s video of J.T. to show the presence of the belt that J.T. used in her suicide attempt.

On cross-examination, defense counsel asked Janielle T. about her failure to collect the belt and provide it to the police. Defense counsel also questioned Janielle T. about her anger when Mr. Johnson moved out. In addition, counsel questioned

Janielle T. about allegations of sexual assault she made against her father when she was around ten years old, which she subsequently retracted before a grand jury. Janielle T. acknowledged in response to questions that, despite maintaining that her father had abused her and her sister, she left J.T. at the house where her father lived on multiple occasions. Finally, counsel asked about Janielle T.'s false statements to CFSA about her son's injury and her coaching of J.T. to repeat the false statements. Counsel did not broach the subject of the video, nor had he done so in his cross-examination of J.T.

On re-direct examination of Janielle T., the government sought admission of the entirety of the recording. The trial court initially stated that the recording "will be admitted without objection," but defense counsel noted his "earlier objections to it" while recognizing that the court had ruled and stating that, "given the [c]ourt's ruling[,] we have no objection"; the court then admitted the video "over objection."

The government stated that it was moving for admission of the video both for "the demeanor of both" Janielle T. and J.T. "and because this video has been put into issue." The government also requested an instruction that the video was being admitted not for the truth of the matter but rather to show "that a report of rape was made and to evaluate the demeanor of the witnesses." The trial court provided such

an instruction to the jury and observed that the video was being admitted over objection.

The government then played the entire video for the jury, pausing it periodically to ask Janielle T. questions about it. As noted above, in the video, in addition to recounting specific instances of sexual abuse, J.T. said that Mr. Johnson forced her to engage in oral sex ten to twenty times, and she spoke repeatedly of bribes and violent threats by Mr. Johnson. Janielle T. asked J.T. to explain or expand on certain statements, cried and wailed, and said, among other things, "God . . . is going to get him for what he did."

After playing the full video, the government asked Janielle T., "[D]id you and [J.T.] fabricate that video?" and Janielle T. answered, "No, that's the truth. Nothing but the truth."

3. The next trial day, before the defense put on its case, the government put on the record, to make it "abundantly clear," that it had introduced the recording "in part to show the belt in the beginning, in part to show the report of rape under *Battle* and, in large part, for the demeanor evidence, both [J.T.'s] demeanor under *Garibay* [*v. United States*, 72 A.3d 133 (D.C. 2013),] and *Street* [*v. United States*, 602 A.2d 141 (D.C. 1992)], but also for both of their demeanor[s] to rebut the fabrication theory." The government added that it understood that, although

Mr. Johnson "objected to the introduction of the recording as a general matter, if portions were admitted, [he] wanted the entire thing admitted to argue [a] fabrication theory." The government further asserted that, "although [Mr. Johnson] objected to the admission of the exhibit, [he] agreed that, given the [c]ourt's prior ruling, the door had been opened [and] an instruction was given at the time."

Defense counsel stated, "I think that's accurate," but then added, "I don't believe we conceded that the door was opened. We maintained an objection to the videotape throughout. Your Honor made the ruling; that's the ruling."

4.      In its final instructions, the trial court told the jury with respect to the recording that "the mere repetition of a statement or accusation does not mean that the statement or accusation is true." It also instructed the jury that it could use the information contained in the recording only (1) "as evidence that [J.T.] disclosed aspects of the alleged sexual abuse charges in this case to Janielle [T.] prior to her testimony in court"; (2) for "the demeanor of [J.T.] at the time of making the report of sexual abuse to Janielle [T.] as evidence that she was a victim of sexual assault"; and (3) for "the demeanor of Janielle [T.] during the conversation with [J.T.], if you choose, in evaluating whether . . . [J.T.] fabricated the allegations of sexual abuse by Mr. Johnson." The court further told the jury that the "recording was admitted for the limited purpose of establishing that . . . [J.T.] made the earlier report" and was

"not admitted for the truth of the contents of her statement and you may not consider the testimony as proof that what she said was true." Finally, the court reiterated that the jury could not "consider the substance of the words that either Janielle or [J.T.] used for the truth of the matter asserted in those words."

5. In closing argument, the government told the jury that it had "heard the recording that [Janielle T.] made right after" walking in on J.T. attempting suicide, but it stated that the jury could use the recording for the "very limited" purpose of "evaluat[ing] [Janielle T.'s] demeanor and how emotional she was."

Defense counsel in closing argued that Janielle T. previously made up a story and used J.T. with respect to her son's broken leg and that that supported a conclusion that she did the same in this instance. Counsel also stated that the jury could play the recording, "where the story unfolds."

In rebuttal, the government argued that fabricating the recording would have taken substantial effort and required "two Oscar-worthy actresses to fake this emotion, to convince everyone."

## B. Standard of Review

"We review the admissibility of evidence for abuse of discretion, but the underlying question of whether or not a particular hearsay exception applies to

certain statements is a question of law which we review *de novo*." *Torney v. United States*, 300 A.3d 760, 778 (D.C. 2023) (citation modified).

### C. Discussion

### 1. Preservation

We first address the government's contention that Mr. Johnson waived or forfeited any error by the trial court in admitting the entire recording. We conclude that Mr. Johnson preserved his claim of error.

The government's argument is premised on its claim that Mr. Johnson took "the position [in the trial court] that admission of the full recording was proper." Although the back-and-forth in the trial court was less than clear, we think that on balance the record reflects that Mr. Johnson took the position that the full recording was inadmissible and the trial court acknowledged that position.

Mr. Johnson opposed the government's motion in limine for admission of portions of the recording, arguing that the statements in the video, at least outside of those identifying "instances of improper physical contact," were "highly detailed hearsay." At the motions hearing, defense counsel stated succinctly that the recording "is not admissible." When the trial court admitted the full recording at trial, it explicitly noted—twice—that it was doing so "over objection." When the

government sought to develop the record the next trial day—after Mr. Johnson had already objected and the recording had nonetheless been admitted—it acknowledged that Mr. Johnson "objected to the admission of the exhibit," but it claimed that Mr. Johnson "agreed" that "the door had been opened." Although Mr. Johnson confusingly said, "I think that's accurate," he then asserted, "I don't believe we conceded that the door was opened. We maintained an objection to the videotape throughout." It appears from this record that Mr. Johnson objected to admission of the recording in its entirety and disputed that he had opened the door.

The government acknowledges that Mr. Johnson disagreed in the trial court that he had opened the door, but it claims that he is not challenging the trial court's contrary finding on appeal. As an initial matter, the trial court made no finding that Mr. Johnson opened the door; it simply admitted the recording while noting Mr. Johnson's objection, and the next day, when the government sought to retroactively shore up the record, the court made no comment. In any event, the government's position in the trial court was that the entire recording would be admissible only if Mr. Johnson opened the door, and when it sought admission of the entire recording, it argued that Mr. Johnson had done so. Accordingly, in arguing now that the trial court erred in agreeing with the government and admitting the recording, Mr. Johnson necessarily is challenging the trial court's determination that he opened the door.

The government also asserts that Mr. Johnson agreed that if portions of the recording were admitted, he wanted the entire recording admitted to argue fabrication. Again, we find confusing Mr. Johnson's statement in the trial court that the government's representation of the state of play on admission of the recording was "accurate," but, viewed in its entirety, the discussion in the trial court supports the conclusion that Mr. Johnson did not want the entire recording admitted.

The government next asserts that Mr. Johnson waived his challenge by asking the jury in closing argument to listen to the recording. We do not agree that, with his objection to the recording having been overruled and the recording having been admitted and played, Mr. Johnson could not then seek to make the best of the situation by arguing to the jury that the recording supported his defense theory. *Cf. Jenkins v. United States*, 75 A.3d 174, 193 n.26 (D.C. 2013) (rejecting argument that "appellant waived his confrontation rights by strategically using [a witness's] inadmissible testimony to bolster his defense" and citing *E.L. Cheeney Co. v. Gates*, 346 F.2d 197, 206 (5th Cir. 1965) ("[T]his testimony was elicited after the Court, over vigorous objection, had admitted the general reputation testimony from the

highway patrolman. Counsel were simply trying to make the best of a situation brought about by the Court's ruling.")).[4]

Finally, the government argues that Mr. Johnson at least forfeited his claim because, after the trial court ruled that at least portions of the recording were admissible, Mr. Johnson "neither objected to admission of the full recording, sought to have the government play only particular portions of the video, nor requested that any statements be redacted from the video." As stated above, however, Mr. Johnson objected to admission of the entire recording, and the trial court recognized as much. We do not agree that he had to object again or suggest specific redactions to preserve the crux of his claim, which appeared to be that, even if limited portions of the recording were admissible under the report-of-rape rule, the bulk of the recording contained highly prejudicial hearsay and was not admissible.

---

[4] We said in *Hood v. United States*, 268 A.3d 1241 (D.C. 2022), that "where the government improperly elicits evidence but the defense turns the violation to its own advantage, the defendant cannot on appeal be heard to complain of the prejudice the evidence allegedly caused." *Id.* at 1250 (citation modified). In *Hood*, however, the defendant "multiple times" and "repeatedly" sought to turn objected-to testimony to his advantage. *Id.* We contrasted that situation with one in which a defendant "simply tr[ies] to take the sting out of the evidence that had been admitted." *Id.*; *see Fuller v. United States*, 873 A.2d 1108, 1118 n.13 (D.C. 2005) ("We take appellant's point that, once the trial judge had decided to give the transcript to the jury, defense counsel had no option but to make the best of the unwanted ruling."). We see defense counsel's brief reference to the jury's ability to listen to the recording as the latter scenario.

Ultimately, while defense counsel's statements were at times inconsistent, the trial court was on notice of Mr. Johnson's challenge to the admission of the entire recording. *See Wilson-Bey v. United States*, 903 A.2d 818, 828 (D.C. 2006) (en banc) (purpose of the contemporaneous objection rule is satisfied if the trial court is "on notice" that the defendant's "position on the correct rule of law differed from the court's"). Accordingly, we now proceed to assess Mr. Johnson's claim as preserved.

### 2. Admissibility

We begin by noting what is before us on appeal. Mr. Johnson does not appear to take issue with admission of the testimony by J.T. and Janielle T. that J.T. reported the sexual assaults to Janielle T. and that Janielle T. recorded the conversation. Nor does he challenge the admission of the opening seconds of the video when the belt is visible. And Mr. Johnson seemed to concede in the trial court that certain limited portions of the recording might have been admissible under the report-of-rape rule.

The issue before us is whether there was a basis to admit the entirety of an almost-twenty-minute out-of-court conversation between J.T. and Janielle T., recorded some ten months after the fact, containing prior consistent statements about the events at issue as well as both factual claims that were not elicited in court under oath and highly charged reactions and comments about the defendant. As we tried

to make clear in *Torney*—a case neither party cites—the report-of-rape rule does not sanction admission of this type of evidence.

To repeat, in *Torney* we made clear that *Battle* "recognized a *limited* exception to the bar on prior consistent statements," 300 A.3d at 778 (emphasis added), and that "*Battle* is not an open invitation to allow any and all forms of report," *id.* at 779. "'[O]nly enough details to show that the complainant reported the sexual assault charged' can come in, since 'the testimony is offered to bolster the credibility of the complaint' against these prejudices, not for its substance." *Id.* (quoting *Battle*, 630 A.2d at 222-24). We added that "*Battle* clearly confined its scope to admitting only enough facts to substantiate that a report was made, solely for the purpose of combatting societal misconceptions," *id.* at 780, and that the "logical corollary of *Battle* is that when the evidence of report goes beyond combatting the societal misconceptions and encroaches on biasing the jury for its cumulative effect, the evidence must be curtailed," *id.* "This," we said in *Torney*, "aligns with our general approach to hearsay evidence, which (in the absence of formal rules of evidence) this court has restricted in order to ensure that the focus of a trial remains on sworn, in-court testimony." *Id.* *See also In re L.C.*, 41 A.3d 1261, 1263 (D.C. 2012) ("Testimony admitted under the report-of-rape rule properly includes 'only enough details to show that the complainant reported the sexual assault charged.'" (quoting *Battle*, 630 A.2d at 223)); *Dyson*, 848 A.2d at 612 (no abuse of discretion in

admitting testimony under report-of-rape rule where "only bare, non-detailed facts were admitted").

Applying these principles, we do not see a basis for admission of the entire recording at issue in this case. The report-of-rape rule was satisfied by the testimony of both J.T. and Janielle T. that J.T. reported the rape to Janielle T. To the extent certain portions of the recording also might have been admissible to provide further evidence of and context to J.T.'s report, the trial court exceeded its discretion in admitting the entire recording, with all that it contained.

The government sought admission of the entirety of the recording in the trial court, and argues in this court that such admission was proper, on two theories: (1) that Mr. Johnson "opened the door" by asserting "fabrication" and (2) that the recording was necessary to show both J.T.'s and Janielle T.'s "demeanor." We address these theories in turn.

With respect to fabrication, the government appears to be positing two related but distinct points. First, the government contends that the entire video was admissible to rebut a claim that the allegation of sexual abuse was fabricated. Of course, this type of fabrication claim is the basis for the report-of-rape rule itself, and Mr. Johnson does not appear to challenge the admissibility of the fact of J.T.'s report to Janielle T. The question remains whether the entire recording, containing

a significant amount of additional hearsay, was admissible to rebut a claim that the allegations were fabricated.

In certain situations, such prior consistent statements can be admissible to rebut a charge of fabrication. *See* D.C. Code § 14-102(b) ("A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is . . . (2) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the witness of recent fabrication or improper influence or motive."); *see also Wilson v. United States*, 266 A.3d 228, 240-41 (D.C. 2022). The government, however, has not invoked the prior consistent statement doctrine (nor did the trial court mention it), and seemingly for good reason, as the rule applies only to statements made before the motive to fabricate originated. *See Wilson*, 266 A.3d at 240; *In re C.A.*, 186 A.3d 118, 124-25 (D.C. 2018). Here, Mr. Johnson broke up with Janielle T. well before Janielle T. made the recording.

Second, the government also appears to mean that Mr. Johnson opened the door by claiming fabrication, meaning staging, of the video itself. As an initial, factual matter, the government recognized that the entire video would not be admissible unless Mr. Johnson opened the door, but it does not point to any questioning of the witnesses or argument by Mr. Johnson specifically suggesting that

the video was staged. None of the instances of Mr. Johnson "opening the door" that the government lists in its brief has anything to do with staging of the recording itself; at no point did the government object or warn that Mr. Johnson was "opening the door"; and, as noted above, the trial court did not determine that Mr. Johnson opened the door by suggesting staging to the jury. To be sure, Mr. Johnson challenged the credibility of the allegations on multiple grounds, including during opening statement and closing argument, but the record indicates that, after the pretrial ruling, Mr. Johnson avoided challenging the recording itself.[5] In any event, to the extent the government could introduce surrounding aspects of the report of rape to demonstrate that the report was not fabricated—an issue we address further below—we see no basis for admission of the entire recording, with all of its additional content, for this purpose.

We see similar flaws with the government's references to "demeanor." The government relies on *Garibay v. United States*, 72 A.3d 133 (D.C. 2013), where we held that a detective who received the complainant's report of sexual assault

---

[5] On the facts of this case, with neither identity of the perpetrator nor consent at issue, Mr. Johnson's general denial of the allegations—including his arguments about motive and J.T.'s previous lie on behalf of Janielle T.—necessarily meant that he took the position that the statements in the recording were false. We decline, however, to view this as "opening the door" in the way the issue was litigated pretrial. Otherwise, the only way Mr. Johnson could have avoided "opening the door" would essentially have been for him to not contest the truth of the allegations.

permissibly testified, in addition to the fact of the report, about the complainant's demeanor when she made the report, because that context was "independent evidence that she was the victim of a sexual assault." *Id.* at 137. Here, *Garibay* means that J.T. and Janielle T. could testify about J.T.'s demeanor when she reported the assaults to Janielle T.—and the government elicited that very testimony, with J.T. saying that it was "scary" when she told Janielle T. and Janielle T. saying that J.T. was "crying" and "ripped apart." But in *Garibay* itself we observed that the detective's in-court description of the complainant's demeanor "conveyed no out-of-court statements by her." *Id.* at 138. And as we observed in *Torney*, "[n]owhere [in *Garibay*] did we state that the demeanor observations needed context from the complainant's statements themselves and thereby justified those statements' admission." 300 A.3d at 781 n.19. Moreover, as explained above, even to the extent portions of the recording could come in as context for J.T.'s report of rape, the mere invocation of "demeanor" did not justify admission of the entire recording at issue in this case.

The government also referred in the trial court and refers in this court to a need to establish *Janielle T.'s* demeanor, but we fail to see how Janielle T.'s reactions during the recording fall under *Garibay*. *See* 72 A.3d at 137-38 ("*[T]he complainant's* demeanor when discussing the subject is independent evidence that she was the victim of a sexual assault, just as a physical injury might constitute such

evidence." (emphasis added)). The government's point seemed to be that Janielle T.'s demeanor in the recording supported a conclusion that the conversation was not fabricated, but that takes us back to the problems with the government's "fabrication" arguments outlined above.

In the final analysis, the circumstances of this case require us to reiterate what we said in *Torney*: "*Battle* clearly confined its scope to admitting only enough facts to substantiate that a report was made, solely for the purpose of combatting societal misconceptions," and evidence that goes beyond this scope "must be curtailed." *Id.* at 780. As in *Torney*, admission of the lengthy recording in this case "exceeded the boundaries of *Battle*." *Id.* at 781.

### 3.    Harm

We must next address whether the erroneous admission of the recording requires reversal. "Generally, a nonconstitutional error is harmless if we can say with fair assurance that the error did not substantially sway the judgment." *Sims v. United States*, 213 A.3d 1260, 1272 (D.C. 2019) (citation modified); *see Townsend v. District of Columbia*, 183 A.3d 727, 734 (D.C. 2018) ("The issue is not whether the evidence was sufficient for conviction even without the erroneously admitted evidence—we have no trouble concluding that it was—but rather whether we can say with fair assurance, after pondering all that happened, without stripping away

the erroneous action from the whole, that the judgment was not substantially swayed by the error." (citation modified)); *id.* ("To conclude that an error is harmless under *Kotteakos* [*v. United States*, 328 U.S. 750 (1946)], we must find it *highly probable* that that error did not contribute to the verdict." (citation modified)).  We cannot say that is the case here.

This is not a case, like *Torney* or *Battle*, involving minimally detailed, cumulative out-of-court statements.  *See Torney*, 300 A.3d at 782 (statements improperly admitted under report-of-rape rule were "quite barebones" and "the government still would have been able to present evidence" of the same facts); *Battle*, 630 A.2d at 223 (details inadmissible under report-of-rape rule were "not lengthy," "very brief," and cumulative).  The nearly twenty-minute recording depicting J.T. expanding on the things she said on the witness stand and her mother reacting and consoling her played a prominent role at trial, with Janielle T. narrating the recording during her re-direct examination and the government relying on the recording in closing argument and rebuttal to support Janielle T.'s demeanor and credibility.  *See Gabramadhin v. United States*, 137 A.3d 178, 186 (D.C. 2016) ("We have emphasized that a 'prosecutor's stress upon the centrality of particular evidence in closing argument tells a good deal about whether the admission of the evidence was . . . prejudicial.'" (quoting *Morten v. United States*, 856 A.2d 595, 602 (D.C. 2004))).

Moreover, the recording contained multiple highly prejudicial statements by both J.T. and Janielle T., including repeated uncharged allegations of violent threats by Mr. Johnson—blowing up the whole house, breaking into the apartment and kidnapping J.T., and killing Janielle T.—that were not independently proven at trial, as well as a reference to divine justice. *See Bieder v. United States*, 662 A.2d 185, 189 (D.C. 1995) ("This court has recognized that the admission of evidence of uncharged criminal conduct may seriously prejudice the jury against a defendant."); *Ali v. United States*, 520 A.2d 306, 309, 316 (D.C. 1987) (finding error harmful where "highly prejudicial uncharged misconduct evidence was erroneously admitted," even where the trial court had provided a limiting instruction about the use of the evidence); *cf. Sandoval v. Calderon*, 241 F.3d 765, 777 (9th Cir. 2000) ("[R]eligious arguments have been condemned by virtually every federal and state court to consider their challenge.").

The government points to the trial court's limiting instructions and the government's own reminders to the jury of the ostensible purposes for which the recording was admitted. We recognize that "[j]uries are presumed to follow their instructions," *Parker v. United States*, 249 A.3d 388, 410 (D.C. 2021), but the presumption is just that—a presumption—and it can be rebutted based on the record, *see Teoume-Lessane v. United States*, 931 A.2d 478, 497 (D.C. 2007). While the government was saying out of one side of its mouth that the recording was not being

admitted for the truth of the matters asserted, out of the other side it was simultaneously eliciting an assertion from Janielle T. that the recording was "the truth. Nothing but the truth." The government also reminded the jury that it had "heard the recording that [Janielle T.] made right after" walking in on J.T. attempting suicide and argued that the contents of the recording could not have been faked. As noted above, the government's almost singular focus on demonstrating that the recording was not fabricated belies any claim that it was not relying on the recording for the truth of the matters asserted therein.

Accordingly, the erroneous admission of the recording was not harmless, and reversal of Mr. Johnson's convictions is required.

### III. Conclusion

For the foregoing reasons, the judgment of the Superior Court is reversed, and the case is remanded for further proceedings.

*So ordered.*